FILED

2020 Dec-29  PM 02:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

LANNY KITCHENS,              )
                             )
        Plaintiff            )
                             )
    vs.                      )      Case No.   4:19-cv-01846-HNJ
                             )
SOCIAL SECURITYADMINISTRATION, )
COMMISSIONER,                )
                             )
        Defendant            )

## MEMORANDUM OPINION

Plaintiff Lanny Kitchens seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding his claim for a period of disability, disability insurance, and supplemental security income benefits.   The undersigned has carefully considered the record, and for the reasons expressed herein, the court **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.   The Regulations define

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.

"disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months."   20 C.F.R. §§ 404.1505(a), 416.905(a).   To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process.   *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).   The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far.   *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).   Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ."   *Id.* at §§ 404.1520(c), 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part

2

404, Subpart P, App. 1, §§ 1.00–114.02.  *Id.* at §§ 404.1520(d), 416.920(d).  If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925.  That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment.  *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work.  *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.  *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.   20 C.F.R. §§ 404.1512(b)(3), 416.912(b)(3), 404.1520(g), 416.920(g).   If the claimant can perform other work, the evaluator will not find the claimant disabled.   *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g).   If the claimant cannot perform other work, the evaluator will find the claimant disabled.   20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"   *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.   *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a

4

reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Mr. Kitchens, age 45 at the time of the ALJ hearing, protectively filed an application for a period of disability and disability insurance benefits on June 28, 2016, alleging disability beginning January 1, 2015. (Tr. 49, 174-80). He filed an application for Social Security Income benefits on July 8, 2016, alleging disability as of September 13, 203. (Tr. 190-95). During the administrative hearing, Kitchens stated he last worked on September 13, 2013 (Tr. 51, 58), and the ALJ assessed Kitchens's alleged onset date as September 13, 2013. (Tr. 11). Thus, the January 1, 2015, alleged onset date no longer appears operative. The Commissioner denied his claims, and Kitchens timely filed a request for hearing on October 19, 2016. (Tr. 101-14, 117-18). The Administrative Law Judge ("ALJ") held a hearing on June 14, 2018. (Tr. 45-68). The ALJ issued an opinion denying Kitchens's claim on September 19, 2018. (Tr. 8-19).

Applying the five-step sequential process, the ALJ found at step one that Kitchens had not engaged in substantial gainful activity since his alleged onset date. (Tr. 13). At step two, the ALJ found Kitchens had the severe impairments of affective disorder and schizophrenia. (Tr. 13). At step three, the ALJ found that Kitchens's

impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 14).

Next, the ALJ found that Kitchens exhibited the residual functional capacity ("RFC") to

> perform a full range of work at all exertional levels but with the following non-exertional limitations:   He can understand, remember, and carryout simple instructions and tasks for 2-hour blocks of time.   He can perform occasional work-required interaction with co-workers and the public, and tolerate changes in the workplace that are infrequent and gradually introduced.

(Tr. 17).

At step four, the ALJ determined that Kitchens could perform his past relevant work as a floor technician.   (Tr. 19).   Accordingly, the ALJ determined that Kitchens has not suffered a disability, as defined by the Social Security Act, since September 13, 2013.   (*Id.*).

Kitchens timely requested review of the ALJ's decision.   (Tr. 172-73).   On September 19, 2019, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision.   (Tr. 1-3).   On November 13, 2019, Kitchens filed his complaint with the court seeking review of the ALJ's decision.   (Doc. 1).

## ANALYSIS

In this appeal, Kitchens argues: (1) the ALJ improperly considered the consulting psychologist's opinion; (2) the ALJ improperly found Kitchens could perform his past work; (3) the ALJ's hypothetical question to the VE did not fully state all of Kitchens's impairments and limitations; and (4) the Appeals Council improperly failed to consider post-hearing evidence.   For the reasons discussed below, the undersigned finds Kitchens's arguments do not warrant reversal.

## I.   The ALJ Properly Considered the Consulting Psychologist's Opinion

Kitchens argues that the ALJ improperly considered the opinion of consulting psychologist Samuel E. Fleming III, Ph.D.  To determine the weight due a medical opinion, an ALJ must consider several factors, including the examining relationship, the treatment relationship, the evidence presented to support the opinion, the consistency of the opinion with other evidence, and the specialization of the medical professional. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see Davis v. Comm'r of Soc. Sec.*, 449 F. App'x 828, 832 (11th Cir. 2011) (stating that the ALJ will give more weight to the medical opinions of a source who has examined the plaintiff and opinions that are supported by medical signs and findings and are consistent with the overall "record as a whole").  The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion.  *Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) (citing *Bloodsworth*, 703 F.2d at 1240).  However, the ALJ must "state with at least some

7

measure of clarity the grounds for his decision." *Winschel*, 631 F.3d at 1179.  This measure of clarity requires the ALJ to state the weight given to each medical opinion and the reason therefor.  *Id.*

Dr. Fleming completed a mental status examination on September 27, 2016, and provided a written report on October 3, 2016.  Kitchens presented to the examination casually dressed and with poor personal hygiene.  Kitchens informed Dr. Fleming he had received a diagnosis of bipolar disorder, and he began "having problems emotionally" four to five years earlier.  He described himself as quick-tempered, depressed, and unmotivated, but he did not report any symptoms of mania, and he had never received any psychiatric treatment.  Kitchens did not communicate effectively during the examination.  He reported serving 18 months in jail for charges of trespassing and possession of a controlled substance.  He used methamphetamines and steroids in the past, but he reported no current drug use.

During the examination, Kitchens's speech "was not spontaneously produced and often did not make any sense whatsoever."  He displayed full orientation to person, place, time, and situation.  He could not perform serial sevens, thereby displaying deficient concentration and attention.  He displayed adequate immediate memory and adequate recall of digits and objects, but he could not adequately recall objects after five to ten minutes.  He demonstrated a deficient general fund of information, marginally adequate abstraction abilities, and no evidence of blocking,

muteness, repetitions, flight of ideas, loosening of associations, tangentiality, circumstantiality, or confusion.   He denied hallucinations, paranoid delusions, ideas of reference, and obsessive-compulsive traits, but he did report a fire phobia.   He displayed deficient psychological insight, as he did not accept responsibility for his problems or see the potential benefits of mental health assistance.   Dr. Fleming estimated Kitchens functioned in the borderline to low-average range of intellectual abilities.   He displayed appropriate affect and reported no symptoms of anxiety. Kitchens stated he did not perform any chores, and attending church constituted his only social activity.

Dr. Fleming assessed Kitchens with lack of motivation and recurrent, mild depression.   He expected a poor prognosis due to Kitchens's lack of motivation and minimal compliance with the examination process.   He opined that Kitchens could manage financial benefits and understand, carry out, and remember instructions, but he could not respond appropriately to supervision, coworkers, or pressures in the work setting.   (Tr. 367-70).

The ALJ afforded "some weight to the findings and opinions of Dr. Fleming, as he personally evaluated" Kitchens.   (Tr. 16).   However, the ALJ did not credit Dr. Fleming's assessment of Kitchens's ability to interact with others and handle work pressures because that assessment "is not supported by the claimant's own testimony" that he had resided in various group home situations, which the ALJ opined "would

9

require at least some interaction with others." (*Id.*). The ALJ also considered Dr. Fleming's observation that Kitchens only minimally complied with the evaluation process.

Kitchens argues that the ALJ improperly substituted his own opinion for Dr. Fleming's, and that he failed to state adequate reasons for rejecting Dr. Fleming's opinion that Kitchens could not respond appropriately to supervision, coworkers, or work pressures. The court disagrees. The ALJ did not reach an independent assessment of Kitchens's abilities based solely upon his own observations, as did the ALJ's in the cases Kitchens's brief cites. *See, e.g., Graham v. Bowen,* 786 F.2d 1113, 1115 (11th Cir. 1986); *Freeman v. Schweiker,* 681 F.2d 727, 731 (11th Cir. 1982). Rather, he rejected portions of Dr. Fleming's opinion based upon permissible considerations, specifically identified the weight he afforded to different portions of the opinion, adequately articulated the reasons for his decision, and based the decision on substantial record evidence.

Kitchens's minimal compliance and lack of motivation during the examination process constituted a relevant factor for the ALJ's consideration, as even Dr. Fleming documented that lack of motivation in his report. (Tr. 369). In addition, the hearing transcript contains Kitchens's testimony about living in group homes, and the consistency of Kitchens's testimony with Dr. Fleming's opinion constituted another

permissible factor for the ALJ's consideration.   *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).

Most significantly, when rejecting Dr. Fleming's opinion about Kitchens's ability to respond appropriately to supervision, coworkers, or pressures in the work setting, the ALJ relied upon the assessment of Amy Cooper, Ph.D., the state agency psychologist who reviewed the record evidence on October 6, 2016, and concluded Kitchens experienced only moderate impairment of social functioning.

During her review, Dr. Cooper identified Kitchens manifested severe affective disorder, non-severe schizophrenic disorder, and substance addiction disorders.  She assessed mild restriction of daily living activities; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.  She opined that Kitchens's symptoms moderately limited his ability to understand and remember detailed instructions, but they did not significantly limit his ability to remember locations and work-like procedures, or his ability to understand and remember very short and simple instructions.  Kitchens experienced moderate limitation of his abilities to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without distraction, complete a normal

11

workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.

He experienced no significant limitations of his abilities to carry out very short and simple instructions and make simple work-related decisions.  He experienced moderate limitation of his abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  He experienced no significant limitation of his abilities to ask simple questions, request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness.  He experienced moderate limitation of his abilities to respond appropriately to changes in the work setting, travel in unfamiliar places, use public transportation, set realistic goals, and make plans independent of others.  He experienced no significant limitation of his ability to appreciate normal hazards and take appropriate precautions.  (Tr. 76-81).

In summary, Dr. Cooper assessed the following limitations:

A.  [Kitchens] can understand and remember simple instructions and work procedures but will have more difficulty with detailed instructions.

B.  [Kitchens] can carry out simple tasks but will have some difficulty completing complex ones.  [Kitchens] should be able to concentrate and attend to simple tasks for 2 hours and will need all

12

customary rests and breaks.   [Kitchens] would benefit from a flexible schedule as 1-2 days of work per month may be missed due to mental condition.     [Kitchens]   would   benefit   from   casual   supervision. [Kitchens] may need a well spaced work environment with a few familiar coworkers to minimize stress.   [Kitchens] could tolerate ordinary work pressures but should avoid:   excessive workloads, quick decision making, rapid changes, and multiple demands.   [Kitchens] would benefit from all regularly scheduled rest breaks and a slowed pace but will still be able to maintain a work pace consistent for the mental demands of competitive level work.

C.   [Kitchens's] interaction with the public should be casual and non-intensive.     Criticism   or   feedback   should   be   given   in   a   non-confrontational and supportive manner.   [Kitchens] is likely to do best working with a small number of familiar coworkers.

D.   Changes in the work environment or expectations should be infrequent and presented gradually to give time for adjustment.   Travel should   be   restricted   to   local   and   familiar   environments.     [Kitchens] would need assistance with long term goal setting.

(Tr. 81).

Dr.   Cooper   acknowledged   that   Dr.   Fleming   had   provided   more   restrictive findings, but those did not persuade her because the record did not substantially support them, and she believed Dr. Fleming overestimated the severity of Kitchens's limitations.     She also reasoned that Dr. Fleming's findings relied heavily upon Kitchens's subjective reports of symptoms and limitations, and that Dr. Fleming had not treated Kitchens.   (Tr. 82).

The ALJ afforded Dr. Cooper's assessment, other than the possibility of missing up to two days of work each month, great weight because it "appear[ed] consistent with

the available medical evidence and the claimant's testimony." (Tr. 16, 19). That decision complies with Social Security law, which permits an ALJ to favor a medical opinion he perceives as the most consistent with the record evidence. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Davis*, 449 F. App'x at 832. The law also permits an ALJ to credit the opinion of a state agency physician over the opinion of a consulting or treating physician, if the evidence so warrants.

> [T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist.

SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996). As stated in *Duncan v. Berryhill*, No. 3:15-cv-02164-LSC, 2017 WL 3969578 (N.D. Ala. Sept. 8, 2017):

> [M]edical consultants or medical experts are highly qualified medical specialists who are experts in the Social Security disability programs, and their opinions may be entitled to great weight if the evidence supports their opinions. *See* 20 C.F.R. §[§ 404.1527(e), 404.1513a]; SSR 96-6p. Indeed, a medical expert's opinion may be entitled to greater weight than the opinions of treating or examining sources in appropriate circumstances, such as when the medical expert has reviewed the complete case record. *See* SSR 96-6p. In short, an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion." *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418-19 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)).

14

*Id.* at *4. Here, substantial evidence supported the ALJ's decision to credit Dr. Cooper's assessment over Dr. Fleming's.

In summary, the ALJ adequately articulated his reasons for rejecting Dr. Fleming's opinion about Kitchens's social functioning, and he relied upon permissible considerations, including the detailed assessment from Dr. Cooper, which provided substantial evidentiary support for the ALJ's residual functional capacity finding. The ALJ did not err in evaluating Dr. Fleming's opinion.

## II. The ALJ Properly Evaluated Kitchens's Past Work

Kitchens next contends the ALJ failed to consider all the duties of his past relevant work and evaluate his ability to perform those duties despite his impairments. "A claimant for disability insurance benefits bears the burden of proving that he is unable to perform his previous work." *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986) (citing *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)). Despite the claimant's burden in this regard, the Commissioner nonetheless retains the obligation to "develop a full and fair record." *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citing *Nelms v. Bowen,* 803 F.2d 1164, 1165 (11th Cir. 1986); *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981)).

"Where there is no evidence of the physical requirements and demands of the claimant's past work and no detailed description of the required duties was solicited or proffered, the [Commissioner] cannot properly determine whether the claimant has the

residual functional capacity to perform his past relevant work." *Schnorr*, 816 F.2d at 581 (citing *Nelms*, 803 F.2d at 1165).   The Commissioner may obtain the required information directly from the claimant, through vocational expert testimony, or by reference to the Dictionary of Occupational Titles (DOT).   *See* 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) ("We may use the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles' and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity."); *Williams v. Comm'r, Soc. Sec. Admin.*, 805 F. App'x 692, 695 (11th Cir. 2020) (citing 20 C.F.R. § 404.1560(b)(2)) ("In evaluating the demands of a claimant's past work, an ALJ may rely on the job descriptions set forth in the Dictionary of Occupational Titles (DOT) to determine the level of the work (from sedentary to very heavy) it required, as well as the claimant's own account of the work."); *Holder v. Soc. Sec. Admin.*, 771 F. App'x 896, 900 (11th Cir. 2019) (The ALJ appropriately relied on the claimant's testimony, his work history report, vocational expert testimony, and DOT descriptions to "paint a full picture of [the claimant's] past relevant work."); *Waldrop v. Comm'r of Soc. Sec.*, 379 F. App'x 948, 953 (11th Cir. 2010) ("[A]n ALJ may properly consider information in the DOT and a VE's testimony in determining whether a claimant can still perform her past relevant work."); *Savor v. Shalala*, 868 F. Supp. 1363, 1365 (M.D. Fla. 1994) ("[I]t is clear that the ALJ did

16

determine the physical demands of the Plaintiff's past work and her ability to perform that work in light of her impairment.  The ALJ accomplished this by eliciting the opinion of a vocational expert.").

Kitchens submitted a Work History Report on July 27, 2016, listing five jobs he held between 1999 and 2016.  For the first job, which involved rehabilitation therapy at a health care facility between 1999 and 2002, Kitchens described working eight to ten hours a day, six days a week.  He swept, mopped, buffed floors and hallways, and assisted with other departments such as laundry and housekeeping.  He used machines, tools, and equipment, and he wrote reports, but he did not employ any technical knowledge or skills.  He walked and/or stood for eight hours each day, but he never sat, climbed, stooped, knelt, crouched, crawled, handled, or reached.  He would write, type, or handle small objects one hour each day.  He frequently lifted less than ten pounds, and he never lifted more than ten pounds.  He spent one hour a day supervising up to 18 people.  He acted as a lead worker, but he did not hire and fire employees.

For the second job, which involved automotive inspection at MS Logistics between 2007 and 2011, Kitchens described working five to six hours a day on varying days of the week.  He used machines, tools, and equipment, but he did not employ technical knowledge or skills, and he did not write reports.  He stood six to eight hours each day, reached one hour each day, and handled, grabbed, or grasped large objects

one hour each day.   He never walked, climbed, stooped, knelt, crouched, or crawled. He frequently lifted ten pounds, and he never lifted more than 20 pounds.   He did not supervise other workers or act as a lead worker.

For the third job, which involved grocery store stocking at Save-A-Lot between 2009 and 2011, Kitchens described working four hours a day and approximately 15-23 hours a week.   He assisted customers as needed, gathered carts, swept, and mopped. He did not use machines, tools, or equipment; employ technical knowledge or skills; or write reports.   He walked and/or stood for six hours a day; crouched and crawled for one hour a day; and never sat, climbed, stooped, knelt, handled, grabbed, grasped, reached, wrote, typed, or handled small objects.   He frequently lifted 25 pounds, and he never lifted more than 20 pounds.   He did not supervise other workers or act as a lead worker.

For the fourth job, which involved janitorial work at Gadsden Regional Medical Center between 2011 and 2013, Kitchens described working eight hours a day, five to six days a week.   He swept, mopped, and buffed floors and hallways.   He wrote down his activities on a sheet of paper.   He used machines, tools, and equipment, but he did not employ technical knowledge or skills.   He walked and/or stood six to seven hours a day; sat one to two hours a day; wrote, typed, or handled small objects one to two hours a day; stooped one hour a day; and never climbed, knelt, crouched, crawled, handled, grabbed, grasped, or reached.   He frequently lifted ten pounds, but he never

18

lifted more than 20 pounds.  He did not supervise other workers or act as a lead worker.

For the fifth job, which involved stocking and labor at a convenience store between 2014 and 2016, Kitchens described working two hours a day, seven days a week.  He attempted to communicate with customers to assist with their shopping needs, and he also performed stocking and cleaning duties.  He did not write reports or use machines, tools, or equipment, but he did employ unspecified technical knowledge or skills.  Despite stating that he worked only two hours a day, Kitchens indicated he walked and stood for eight hours each day, sat for two hours each day, handled small and large objects one hour each day, occasionally stooped, and never climbed, knelt, crouched, or crawled.   He also inconsistently stated that he frequently lifted 25 pounds, but he never lifted more than 20 pounds.   He did not supervise other workers or act as a lead worker.  (Tr. 248-55).

During the administrative hearing, the ALJ ensured that the vocational expert possessed all the information she needed to assess Kitchens's past relevant work.  (Tr. 57-58).  The vocational expert recognized Kitchens's past work as a floor waxer and stock clerk, and she provided DOT classifications for both positions.   She also testified that a person with the residual functional capacity the ALJ identified could perform Kilpatrick's past work as a floor waxer.  (Tr. 65-66).  The ALJ then relied upon his own residual functional capacity finding and the vocational expert's testimony to

determine that Kitchens could perform his past relevant work as a floor technician. (Tr. 19).[2]

Kitchens's briefs fail to identify any particular requirement of his past relevant work that the ALJ overlooked, and he has not challenged the qualifications or testimony of the vocational expert.   Because the ALJ relied upon Kitchens's own work reports, the vocational expert's testimony, and the DOT classifications, the court finds that he obtained sufficient information to determine whether Kitchens possessed the residual functional capacity to perform his past relevant work.

## III.   The ALJ Properly Relied Upon the Vocational Expert's Testimony

Next, Kitchens argues that the ALJ did not base his decision on substantial evidence because he did not include all of Kitchens's impairments in the hypothetical question he posed to the vocational expert.   "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."   *Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 903 (11th Cir. 2012) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002)).   However, "the ALJ is not required to include findings in the hypothetical

---

[2] The Vocational Expert used the term "floor waxer," but the ALJ used the term "floor technician." Kitchens has not argued that any material difference exists between the two titles; accordingly, the court will consider them interchangeably.

that the ALJ has found to be unsupported." *Id.* (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11ᵗʰ Cir. 2004)).

The ALJ's hypothetical question to the vocational expert mirrored his residual functional capacity finding.   Kitchens complains that the hypothetical question did not include Dr. Fleming's finding that Kitchens could not respond appropriately to supervision, co-workers, or work pressures; yet, as determined, the ALJ properly rejected that finding.   Thus, the ALJ did not need to include Dr. Fleming's finding in his hypothetical question.   *See Crawford,* 363 F.3d at 1161.   Kitchens also complains that the ALJ did not include any exertional limitations, but he does not identify what limitations the ALJ omitted, and the court cannot discern from the record any exertional limitations that would change the disability finding.

Accordingly, the court concludes the ALJ included all of Kitchens's impairments in the hypothetical question to the vocational expert, and he properly relied on the vocational expert's testimony.

## IV.   The Appeals Council Properly Denied Review and Did Not Err in Failing to Consider Additional Evidence

Kitchens next argues that the Appeals Council improperly denied review in light of new evidence presented after the administrative decision.   Because the new evidence did not present a reasonable probability of changing the administrative result, the court disagrees.

Generally, a claimant may present new evidence at each stage of the administrative process. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007) (citing 20 C.F.R. § 404.900(b)).   The Appeals Council retains discretion to decline review of an ALJ's denial of benefits. *See* 20 C.F.R. § 404.970(b).   However, the Appeals Council must consider new, material, and chronologically relevant evidence. *Ingram*, 496 F.3d at 1261 (citing 20 C.F.R. § 404.970(b)).   The new evidence is material if it is relevant and probative "so that there is a reasonable possibility that it would change the administrative result." *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987) (citations omitted).   The evidence is chronologically relevant if it "relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.970(a)(5); *see also Keeton v. Dep't of Health & Human Servcs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (holding that the Appeals Council must evaluate the entire record, including the new and material evidence submitted if it relates to the period on or before the date of the ALJ hearing decision).   The court must consider whether the new evidence submitted to the Appeals Council renders the ALJ's decision erroneous by undermining the substantial evidence supporting the ALJ's decision. *See Mitchell v. Comm'r of Soc. Sec.*, 771 F. 3d 780, 785 (11th Cir. 2014).

On January 18, 2019, after the ALJ denied Kitchens's claim for benefits, Kitchens submitted an affidavit from his friend Ellen Young Akin, who stated:

22

My husband and I have known Lanny Kitchens since approximately 2005. He rented a room from a friend of ours after his grandmother passed away. According to Lanny, his uncles gave him several hours to vacate her house and he had nowhere to go.

Lanny stated that when he was about 5, his mother drove him to within 4 or 5 blocks of his grandmother's home, put him out of the car with a small sack of his belongings and told him to walk to his grandmother's. His sister remained in the car. He did not see his mother or sister again until he was much older.

As long as I have known Lanny, he has lacked social skills and does not interact well with others. Also, in a split second he can go from being in a good mood to turning very angry and belligerent. He often lives in a fantasy world, thinking odd jobs he does for random people are actual jobs. Once, someone bought him a meal because Lanny swept their parking lot. Lanny was furious because the person assumed he needed food more than money.

Once my health started declining (I will turn 70 in May), and his anger increased, I had to greatly limit what I did for Lanny. I understand the anger. I know it is extremely frustrating to live "on the streets," no mater what the weather, and to depend on charity for meals, clothing, and money.

I taught school for 30 years and have 3 degrees (AA and MS in Early Childhood Education, and BS in Elementary Education). I was required to take several Special Education courses and I have attended numerous Special Education/Special Needs workshops. One of the major components of Alabama Early Childhood classes is learning to recognize children with special needs as early as possible. Although I did not know Lanny Kitchens when he was a child, I see signs of him having Manic Depression and Bipolar characteristics, as well as having feelings of abandonment.

Even if Lanny recognized that he had a problem, he would have difficulties seeing a doctor on a regular basis. Lanny has no income, no home, no car, no cell phone. I wish that I could provide assistance to

him, but I am now a caregiver for my husband and in poor condition
myself.

Even if Lanny had clean clothes, he has no place to keep them and
no place to shower on a regular basis.  He has so much pride that he
doesn't want others to know of the miserable conditions he lives in.
Because his personality can change in a split second, he has few, if any,
friends.  Every time I see Lanny, he is a little worse, mentally and
physically.  He limps when he walks and it is obvious that he is in pain.
His moods can change in seconds.  Not only has he been abandoned by
his family and friends, now his country has abandoned him.

(Tr. 32-33).

In denying Kitchens's request for review, the Appeals Council stated:

You submitted a statement from Ellen Young Akin dated January
18th, 2019.  The Administrative Law Judge decided your case through
September 19, 2018.  This additional evidence does not relate to the
period at issue.  Therefore, it does not affect the decision about whether
you were disabled beginning on or about September 19, 2018.

(Tr. 2).

Akin's affidavit unquestionably is "new," in the sense that it did not exist before

the ALJ's decision.  Moreover, even though Akin did not execute the affidavit until

approximately four months after the ALJ's decision, it still bears some chronological

relevance because it contains some information that relates to the period on or before

the decision.  Akin stated she had known Kitchens since 2006, and she described the

long-term state of his mental health condition, not just his current state on the date of

the affidavit.  *See Hunter v. Soc. Sec. Admin., Comm'r*, 705 F. App'x 936, 939-40 (11th Cir.

2017) (holding that new evidence dating after the ALJ's decision can still be

24

chronologically relevant if it contains information relating to the time period before the decision).

Even so, the Appeals Council did not err in failing to consider Akin's affidavit because no reasonable possibility existed that it would change the administrative result. Pursuant to the regulations, in addition to evidence from acceptable medical sources, the ALJ "may also use evidence from other sources to show the severity" of the claimant's impairment and how it affects his ability to work.   20 C.F.R. §§ 404.1513(d), 416.913(d).[3]   SSR 06-3p states:

> In considering evidence from "non-medical sources" who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity.   Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given the opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

---

[3] The Commissioner revised its regulations regarding the consideration of medical and other sources for all claims filed after March 27, 2017.   *See* 82 FR 5844-01, 2017 WL 168819 (Jan. 18, 2017). Because Kitchens filed his claim for benefits before March 27, 2017, the previous version of the regulation governs.

SSR 06-3p, 2006 WL 2329939, at *6.[4]

"The ALJ has a duty to make clear the weight accorded to each item of evidence and the reasons for the decision so that a reviewing court will be able to determine whether the ultimate decision is based on substantial evidence." *Freeman v. Barnhart*, 220 F. App'x 957, 959-60 (11th Cir. 2007) (citing *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)). This includes lay testimony from friends and family members. *See De Olazabal v. Soc. Sec. Admin., Comm'r*, 579 F. App'x 827, 832 (11th Cir. 2014) (citing 20 C.F.R. § 404.1513(d); SSR 06-3p).

As an initial matter, the applicable regulations deem Ms. Akin an "other source," as defined by 20 C.F.R. §§ 404.1513(d) and 416.913(d). Accordingly, the evaluator may use her statement "to show the severity of [Kitchens's] impairment(s) and how it affects his ability to work"; however, such evidence may not establish the existence of a medically determinable impairment. 20 C.F.R. § 404.1513(d); *see also* SSR 06-3p, 2006 WL 2329939 (Aug. 9, 2006). Rather, the record must contain evidence from an "acceptable medical source" for this purpose.

However, "other sources" may possess special knowledge about an individual and may provide insight into the severity of his impairments and how they affect the

---

[4] The Commissioner rescinded SSR 06-03p effective March 27, 2017. However, because Kitchens filed his application for benefits in 2016, the ruling in effect at that time governs the analysis. *See* Rescission of Soc. Sec. Rulings 96–2p, 96–5p, and 06–3p, SSR 96–2p, 2017 WL 3928298 (Mar. 27, 2017).

individual's ability to function.   The weight accorded such evidence will vary according to the particular facts of the case; the source of the opinion, including that source's qualifications; the opinion subject matter; and many other factors.   SSR 06-03p.   The rules do not require the ALJ to accord any particular weight to evidence from "other sources."   *See McMahon v. Comm'r Soc. Sec. Admin.*, 583 F. App'x 886, 891-92 (11th Cir. 2014).

The statement Ms. Akin submitted to the Appeals Council was her third.   She submitted two statements prior to the ALJ's decision.   On May 7, 2018, she attested:

> I was told by several of Lanny's relatives that he was abandoned by his parents as a small child, diagnosed as bipolar, but his grandmother who took him in could not afford treatment or medication.   During the past 20 years, I have seen Lanny's mental health decline.   He no longer showers or changes clothes.   He has become extremely irrational and considers any "odd job" for a few dollars that he does, as gainful employment.   He no longer trusts people, has a difficult time focusing on a conversation, has unrealistic views of many things and is extremely uncomfortable in group situations.   His comprehension is poor, he accomplishes very little, and becomes very irrational over extremely minor things.   Judging from his gait when he walks, he has back trouble and he often complains of pain in his back, neck, and legs.

(Tr. 285).

On June 1, 2018, Akin attested:

> I have known Lanny Kitchens for the last 8 years.   In 2017 I lived close to Mr. Kitchens and saw him on a regular basis.   In 2018 I probably saw him once every two or three months.
>
> I also knew him in 2012 when he was working.   I would take him to different places to apply for jobs after he lost his job.

27

As long as I have known Mr. Kitchens he has always had mental problems.   He has difficulty getting along with people.   On the one hand he can be a very friendly person but he is always suspicious and distrustful of people and he believes that people are out to get him.   Those attitudes have interfered with his ability to work.   I have tried to help Mr. Kitchens in numerous ways, but when I am with him he has complained about his back pain.   However, clearly his primary problem is his mental condition. He told me that he went to CED Mental Health but they said that they could not help him.

When he would go in for a job interview he would come out and be highly critical of the personnel and complain that they did not seem to trust him and they were not running the shop right.

I know Mr. Kitchens wants to work but it is obvious to me that he is not able to work on a sustained basis because of his mental problems and his paranoia and his inability to get along with people.   His mental condition is getting increasingly worse.

(Tr. 293).

The ALJ considered both of Ms. Akin's previous statements, stating:

I note that [Kitchens's] friend, who provided a 3rd party statement, as noted above, is not medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods and mannerisms. Moreover, by virtue of her relationship with [Kitchens], she cannot be considered a strictly disinterested third party witness, whose reports of restriction in functioning would not tend to be discolored by affection for [Kitchens] and a natural tendency to agree with the symptoms and limitations [Kitchens] alleges.   Taking all of these factors into consideration, including the extent to which her statement is consistent with other evidence, as well as other factors that tend to support or refute the evidence, the undersigned affords her opinions and observations only partial weight.

(Tr. 17).

28

Kitchens did not challenge the ALJ's consideration of Ms. Akin's first two statements, and the court finds the ALJ considered those statements in accordance with the requirements of SSR 06-3p and the case law cited above.   Ms. Akin's third statement does not add any materially different information.   Therefore, if the ALJ properly afforded the first two statements only partial weight, the Appeals Council could also properly afford the third statement only partial weight.   Nothing in Ms. Akin's third statement could reasonably change the outcome of the administrative decision.   Accordingly, the ALJ did not err in denying review and refusing to consider Ms. Akin's third statement.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 29th day of December, 2020.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE